BOLIN, Judge.
Gulf Oil Corporation sues defendants seeking reimbursement for certain production payments made by it under an oil and gas lease on property located in Caddo Parish, Louisiana. Defendants acquired the lease from Gulf on February 1, 1960. Following trial on the merits the lower court rendered judgment in favor of Gulf, but in an opinion on application for new trial the court reversed its judgment and rendered an award in favor of defendants Noel L. Adams, Jr. and the other heirs of Noel L. Adams, Sr., now deceased. From this judgment Gulf appeals.
This appeal deals primarily with the interpretation of certain portions of the assignment to the Adamses, but an understanding of the entire matter requires some recitation of the transactions leading up to the agreement of 1960.
Originally a number of oil and gas leases were acquired from the property owners by Haynes Production Company, Inc. in 1933, 1934 and 1935. By a recorded assignment in April, 1936, Standard Oil Company acquired the lease of the property herein involved, together with other leases which are of no consequence in the instant case, and on May 15, 1936, Standard assigned an undivided one-half interest in these leases to Gulf Refining Company. Concurrently therewith, by an unrecorded agreement, Gulf assumed one-half of the obligations, incurred by Standard in its acquisition from the stockholders of Haynes, being designated as one-half of three-sixteenths of seven-eighths of all oil and gas produced from the assigned leases. It was further agreed Standard would continue as operator of the leases. The remaining undivided one-half interest was retained by Standard, which was succeeded by and subsequently became Carter Oil Company and these companies continued as operators of Caldwell #5, which is the only producing well located on the property involved in this case.
On August 1, 1959, Carter subleased its one-half interest in the Caldwell #5 well to Noel L. Adams, Sr. and Noel L. Adams, Jr., reserving to itself an overriding royalty of one-half of three-sixteenths of seven-eights of all oil, gas and casinghead gas produced and saved from the premises which were subleased. The reserved portion was tantamount to Carter’s one-half of the production payments due the shareholders of Haynes Production Company in *772 the original sale and assignment to Standard.
All of the actual transfers, assignments and subleases were recorded. However, in conjunction with the transfers unrecorded collateral agreements were executed by the parties dealing with the operating expenses of the various leases. Additionally, Standard contracted that part of the original consideration to the Haynes shareholders was to be a production payment of three-sixteenth of seven-eighths of all production from the producing wells until such time as said payments totaled Ten Million Dollars.
Gulf Oil Corporation, successor to Gulf Refining Company, assigned all of its right, title and interest in Caldwell # 5 to defendants on February 1, 1960. This transfer was made without warranty of title and was subject to certain exceptions, the pertinent one being:
“It is recognized that the rights and interests herein conveyed are subject to an agreement, as amended, made and entered into under date of May 15, 1936, by and between Standard Oil Company of Louisiana and Gulf Refining Company, buyer having succeeded to the rights, duties and obligations of the said Standard Oil Company of Louisiana thereunder and Seller having succeeded to the rights, duties and obligations of Gulf Refining Company thereunder. Therefore, except for any final accounting between Seller and Buyer, the said agreement, insofar as it covers and applies to the rights and interests herein conveyed, shall be deemed to have terminated as of the effective time and date of this instrument.”
On August 1, 1959, prior to the above assignment, Gulf agreed that Adams should be the operator of the well under an unrecorded instrument wherein the operator (Adams) agreed that the rights, duties and obligations of said operator should be the same as those set forth for Standard in the May 15, 1936 operating agreement. It is in this latter operating agreement that Gulf had assumed the obligation of making production payments which were classified as part of the “other valuable consideration” for the assignment from Standard to Gulf.
At all times prior to this assignment the production payments had been made to the Haynes shareholders by Standard (later Humble Oil & Refining Company) and Gulf had been billed for these payments. After Gulf’s assignment to appellees and pursuant to Article 1 thereof, appellees remitted to Gulf its one-half of net proceeds from the Caldwell lease for gas production during the last four months of 1959 and oil in tanks on February 1, 1960, after deducting .082031 or one-half of three-sixteenths of seven-eighths thereof. This remittance expressly stated it excluded royalty and production payments.
Upon being billed for one-half of the Haynes payment obligation in October 1960, Gulf advised Humble that appellees should be thus billed, and sent appellees a copy of its letter. Humble promptly wrote appellees, sending Gulf a copy of such letter, stating that the Caldwell lease was burdened with the Haynes payment obligation; that as successor to Gulf, appellees would stand one-half of such payment; that Humble would make the entire payment and bill appellees for their share; and that Humble enclosed its statement for $34.47 for appellees’ part of the February 1960 production payment. However, either through oversight or inadvertence, Humble continued to make the production payment to the Haynes shareholders, after Gulf’s assignment to defendants, from 1960 through 1963 without billing Gulf or Adams for such payments.
In January, 1964, Gulf received from Humble a payment due it from other wells and from this payment had been deducted $5,982.32 as reimbursement for the production payments to the Haynes shareholders. This was Gulf’s first notice that Adams had neither paid nor made arrangements *773 for the payment of the contingent consideration payable from production under the lease of Caldwell #5 after February 1, 1960. After considerable correspondence between the parties, this suit was instituted May 13, 1965.
Gulf argues that where a party’s title instrument is signed by him and evidences that his title is burdened with prior obligations arising from recorded or unrecorded documents, he is bound thereby. Gulf further urges that in considering a contract in its entirety, the court should consider the relation of the parties, their connection with the subject matter and the circumstances under which the contract was made and then determine the intention of the parties from the entire agreement; and all clauses are to be construed together in arriving at the intent of the parties thereto, no isolated clause or provision in itself being controlling.
Appellees urge the correctness of the lower court’s decision principally under the law of registry as enunciated in McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909). They contend that since they were “third parties” to the unrecorded agreement dated May 15, 1936, wherein Gulf assumed the rights, duties and obligations of Standard to pay one-half of three-sixteenths of seven-eighths of production, they are not bound thereby. To fortify this argument appellees cite Articles 2236, 2254, 2266 and 2264 of the Louisiana Civil Code and Louisiana Revised Statutes 9:2721 and 9:2722 as well as a number of other cases. Appel-lees conclude from the cited articles, statutes and cases that the law of Louisiana is uniform in requiring instruments which affect immovable property be recorded and that Article 2266 provides such instruments shall be utterly null and void, except between the parties thereto unless they are recorded. Finally appellees cite Louisiana Revised Statutes 9:1105, as amended in 1950, providing that oil, gas and other mineral leases and contracts applying to and affecting these leases or the right to reduce oil, gas or other minerals to possession, together with the rights, privileges and obligations resulting therefrom, are classified as real rights and incorporeal immovable property.
We do not question the correctness of the holding in McDuffie v. Walker. To the contrary, it has been labelled by many legal scholars as the landmark case on the law of registry and has been cited with approval for many years. It held that all contracts affecting immovable property which are not recorded in the parish where the property is situated are “utterly null and void, except between the parties thereto”. This case put at rest the question of whether actual knowledge of a contract affecting immovable property should be considered, as far as third persons are concerned, the equivalent to registry of the contract and it settled that question in the negative.
We do not consider the holding of the McDuffie case to be applicable to the instant case. Here we have a suit between the parties to a contract as to the proper interpretation thereof. True, the subject matter of the contract dealt with certain real rights, but we know of no law that forbids parties to contract about real rights and include specific obligations against the contracting parties by reference to a prior written instrument. This is what was done here, and insofar as the sale or assignment dated February 1, 1960, between Gulf and the Adamses, it is an instrument affecting only the contracting parties and no third party is involved. Appellees woidd have us construe this assignment so as to completely eliminate therefrom the provision relating to the May 15th agreement, even though the latter was in writing and the subject of the very contract between these parties. We hold the sale or assignment dated February 1, 1960, is subject to interpretation and enforcement in its entirety between the parties. La.C.C. Art. 1945 provides :
“Legal agreements having the effects of law upon the parties, none but the par *774 ties can abrogate or modify them. Upon this principle are established the following rules:
First — That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
Second — That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
Third — That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;
Fourth — That it is the common intent of the parties — that is, the intention of all — that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.”
In Action Finance Corporation v. Nichols, La.App., 180 So.2d 81, the court held mortgage provisions, which appeared on the reverse side of the sale and note, were expressly incorporated in the agreement even though the signatures of the buyer and witnesses were on the front page. The court held further:
“* * * the jurisprudence is clear that documents may be incorporated in contracts by attachment or reference thereto. Indeed, this practice has been so universal that it apparently seldom has been drawn into question. The rule has been applied to covenants running with land, specifications in building contracts, and various other matters not contained on the face of contracts themselves.
“Other writings referred to in an instrument, it has been uniformly held, become a part of the agreement between the parties with the same force and effect as if the provisions had been contained in the basic contract where the parties intended it to have such effect. For instance, in Charnley v. Edenborn, 163 La. 945, 951, 113 So. 156 (1927), the court held that a plat referred to in an act of sale of immovable property which was not attached to the act itself was nevertheless made a part of the act of sale. The court therein stated:
“The reference to a plat or plan in an act of sale makes the plat or plan as much a part of the act as if appended to it. Buisson v. McNeil, 9 La.Ann. 445.”
Also see Wells v. Joseph, 234 La. 780, 101 So.2d 667 (1958).
Over appellees’ objections certain letters and documents were introduced into evidence on trial of the case. As this is a suit between the parties to a contract we deem them relevant to the issue of determining the proper interpretation of a provision of this instrument. While it is true appellees did not specifically assume the production payments and Gulf did not reserve an overriding royalty, as was done in the sublease by Carter to the Adamses, nevertheless we believe the disputed clause must be interpreted in the light of the intention of the parties as reflected by their letters exchanged preceding execution of the assignment. These letters include the following:
1. Letter from Noel L. Adams, Jr., dated June 22, 1959, to Gulf Refining Company acknowledging a previous letter relative to Caldwell #5 in which Mr. Adams stated:
“As we informed you previously, we were under the impression that Carter Oil Company owned all of the above well at the time we negotiated with them for the purchase of same together with two other wells in the Rodessa field. We have since learned that Gulf Refining Company owns one-half interest in the above well and that there is a production payment of three-sixteenths on the gas produced. (Emphasis ours)
*775 “Under the circumstances, we are willing to purchase the one-half interest of Gulf Refining Company in and to the above captioned well for a cash consideration of $1,250.00. (Emphasis ours)
“Please advise us at your earliest opportunity as to whether this offer is acceptable.”
2. Copy of letter from Adams to Gulf Oil Corporation dated August 31, 1959, enclosing a statement relative to the operation of the Caldwell #5 well for the month of August (which had been taken over by Adams July 29, 1959), in which Mr. Adams stated:
“Some time ago your office informed us that Gulf Oil Corporation would sell us an undivided one-half (1/2) interest in and to the Caldwell No. 5 Well for $3,000. As you know this well is burdened with an oil payment out of three-sixteenths (Vieth) of seven-eighths (%ths). (Emphasis ours)
“At the present time the gas produced by this well is delivered to Sunray Mid-Continent Oil Co., which company is taking same on a temporary basis. It appears that a change will be desirable in the very near future and, in order to deliver the gas to United Gas Corporation, it will be necessary to lay approximately 1,500 feet of line and deliver said gas against a pressure of 12 to 15 pounds at the point of entry. At the present time, the well is producing against a pressure from 5 to 6 pounds.
“Under the circumstances, we are hesitant to purchase Gulf Oil Corporation’s interest in the above at the quoted price. However, we are willing to make a firm offer of $2,500.00 for this interest at this time. Please advise us as to this offer at your very earliest opportunity.” (Emphasis ours)
3. Letter from Gulf, dated October 29, 1959, rejecting above offer.
4. Letter, dated October 26, 1959, to Gulf Oil Corporation from Mr. Adams relative to a change in gas price to be effected by selling to United Gas rather than Sunray. This letter closes with the statement that if Gulf “does not wish to sell their interest in the Caldwell No. 5, then we propose to lay a line to United Gas and deliver to that company.”
5. Letter, dated December 17, 1959, from N. L. Adams and son to Gulf Oil Corporation wherein Adams asked whether Gulf would bear one-half of expenses of installing a compressor on the subject lease in order to sell to United Gas. In conclusion, Adams extended a “buy or sell” offer to Gulf as follows:
“We will buy Gulf’s one-half interest in and to the Caldwell No. 5 well for a cash consideration of $2000.00, or we will take a like amount for our one-half interest.”
6. Letter dated February 2, 1960, from Gulf to Adams accepting the offer to buy Gulf’s interest for $2,000.
The above letters were objected to on the basis they were not relevant to the issue, although they were identified as being what they purported to be. The appellees contend the exhibits set out above were simply letters which passed between plaintiff and defendants prior to the sale of plaintiff’s interest in the Caldwell lease to defendants. Appellees contend that anything said or discussed prior to the assignment is immaterial (or inadmissible) under La.C.C. Art. 2276:
“Neither shall parole evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.”
The Adamses accepted the assignment subject to the May 15, 1936 agreement between Standard and Gulf and in view of the extensive .correspondence in which Noel L. Adams,'Jr. engaged with Gulf and with Carter it seems apparent that he was *776 contracting with reference to the production payments which he admittedly knew “burdened” the lease from Standard to Gulf. Therefore, this extrinsic evidence was necessary to determine the intention of the parties in contracting as they did. Prior references in Adams’ letters to Gulf and offers made by him on June 22, 1959, and on August 31, 1959, contain the statement that the lease is burdened with a production payment of three-sixteenths on the gas produced and an oil payment out of three-sixteenths of seven-eighths. When the prior offers were rejected Adams finally made the offer to buy or sell to Gulf for $2000. Thus, it seems Adams was aware of the payments due; that he regulated his offers to buy with this production payment in mind and that the final purchase was made subject to the production payments owed by Gulf to the shareholders of Haynes Production Company.
Defendants further argue that their agreement with Gulf terminated by its own-terms under the following provision:
“* * * Therefore, except for any final accounting between Seller and Buyer, the said agreement, insofar as it covers and applies to the rights and interests herein conveyed, shall be deemed to have terminated as of the effective time and date of this instrument.”
From our examination of the termination language we conclude it applies only to the rights and interests being relinquished by Gulf and not to the obligations owed by it. Although “duties and obligations” are referred to in the first sentence of the disputed article nothing is said of them in the second or “termination” sentence of the article. Paraphrasing the disputed provision we deem it to mean:
“Gulf assigns to appellees all of its right, title and interest in and to its undivided one-half interest under the Caldwell lease, subject to all the terms and provisions of the May 15, 1936 agreement; both parties recognizing the rights, duties and obligations imposed by the agreement upon Standard and Gulf. Insofar only as to the rights and interests assigned to appellees are concerned the May 15, 1936 agreement is terminated except for a final accounting.”
We conclude the intention of the parties becomes clear from the wording of the assignment when construed in the light of the transactions preceding and accompanying the contract. The instrument by which appellees acquired Gulf’s lease makes the assignment subject to a specific instrument wherein Gulf’s obligation to the Haynes shareholders was distinctly set forth. We hold that evidence, comprised of letters and documents, was admissible to explain the terms of the act and by such terms ap-pellees intended to and did become obligated to make the production payments.
Appellees operated the Caldwell lease for themselves for some seven years and collected the proceeds from production and after the assignment to appellees Gulf neither had nor subsequently acquired an interest in the lease and received no proceeds therefrom.
For the foregoing reasons the judgment of the lower court is reversed, annulled and set aside and it is now ordered that there be judgment in favor of appellant, Gulf Oil Corporation, and against appel-lees, Noel L. Adams, Jr., Gerald L. Adams and Kathryn Adams in the sum of $5,982.-32 and for such further amounts as Gulf has been obliged to pay since the aforesaid sum was paid, together with legal interest on all such amounts from judicial demand until paid.
It is further ordered that the assignment of the lease, dated February 1, 1960, by Gulf Oil Corporation to Noel L. Adams, Sr. and Noel L. Adams, Jr., recorded in Conveyance Book 886, Page 940, of the records of Caddo Parish, Louisiana, imposed upon appellees the duty and obligation of bearing and discharging one-half of all such amounts as have or may accrue since and after February 1, 1960, as contingent consideration attributable to said *777 lease under an agreement dated May 15, 1936, between Standard Oil Company and Gulf Refining Company in which the latter assumed the obligation to make production payments to shareholders of Haynes Production Company, Inc., described as one-half of three-sixteenths of seven-eights of oil and gas produced on the lease applying to and affecting the following described property:
S Y2 of SE 14 of Section 12, Township 23 North, Range 16 West, Parish of Caddo, State of Louisiana.
Appellees are cast with all costs.
Reversed and rendered.